Filed 8/11/22  P. v. Jimenez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078080 |
| v. | (Super.Ct.No. INF031973) |
| JAVIER BERNAL JIMENEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dale R. Wells, Judge.

Affirmed.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

Defendant and appellant Javier Bernal Jimenez appeals from the trial court's denial of his petition for resentencing under Penal Code[1] section 1170.95. For the reasons forth *post*, we affirm the trial court's order denying defendant's petition.

## STATEMENT OF THE CASE

On October 27, 2000, a jury found defendant guilty of first degree murder under section 187, subdivision (a), and kidnapping under section 207, subdivision (a). The jury also found that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a)(1), and was armed with a firearm within the meaning of section 12022, subdivision (a)(1).

On November 29, 2000, the trial court sentenced defendant to serve 25 years to life in state prison, plus a determinate prison term of 12 years and eight months. After defendant appealed, on May 15, 2002, we affirmed the convictions but ordered that the determinate portion of defendant's sentence to be reduced to 11 years and eight months in prison. (*People v. Jimenez* (May 15, 2002 E028628) [nonpub. opn.].)

On January 18, 2019, defendant filed a petition for resentencing under section 1170.95. Defendant contended that the complaint or information filed against him allowed the prosecution to proceed against him on the theory of felony murder, and that the jury convicted him of murder under the theory of felony murder. Moreover, defendant argued that due to the charges in section 189, he could not now be convicted of

---

[1] All further statutory references are to the Penal Code unless otherwise specified

2

felony murder because: (1) he was not the actual killer, and (2) he was not a major participant in the felony and/or he did not act with reckless indifference to human life.

After the trial court issued an order to show cause (OSC) why defendant's petition should not be granted, the People filed an OSC hearing brief opposing defendant's section 1170.95 petition, and a response to defendant's petition in March 2019. Both briefs had voluminous exhibits attached, including the clerk's and reporter's transcripts from the prior appeal. On October 1, 2021, defendant filed his OSC hearing brief in support of his petition for resentencing.

On October 20, 2021, after an OSC hearing, the trial court denied defendant's petition.

On November 16, 2021, defendant filed his timely notice of appeal.

## FACTUAL AND PROCEDURAL HISTORY[2]

### A.      FACTUAL HISTORY

"*The Testimony of Hector Reyes's Girlfriend*

"Hector Reyes, a drug dealer, and his girlfriend, a methamphetamine user, 'dated' for two weeks. During that time, Reyes visited her at her apartment in the company of his friend, the victim. During each visit, he had a handgun with a clip and the victim had a handgun that looked like a long-barreled western revolver with a wood handle. Also during these two weeks, she, Reyes, and the victim visited Donald Beavers at the latter's

---

[2] The factual history is taken from our opinion in defendant's prior appeal (*People v. Jimenez*, *supra*, E028628).

converted two-car garage.[3]  Reyes had a pound of methamphetamine in a backpack; however, after he left, he discovered that it was missing from the backpack.  He sent the victim back to Beavers's to retrieve it; however, the victim got a flat tire on the way.  Reyes was later told that the victim had been spotted at a casino, giving away money and 'dope.'

"Reyes became possessive of his girlfriend and she feared him, so she moved out of her apartment, to which Reyes had a key, and moved in with a friend for a week.  On the evening of April 22, 1999, the girlfriend placed a phone call, from a pay phone at a store, to Reyes on the cell phone he always carried with him, so Reyes would not know where she was.  Reyes told her that he had earlier gone to her apartment and picked up her dog, whom she left behind when she moved in with her friend.  He had dropped the dog off at her mother's, where he had been looking for her.  Later that night, Reyes picked up his girlfriend and her dog, a pit bull, and then she drove his station wagon to her apartment.  On the way, around 9:00 or 10:00 p.m., Reyes received a call on his cell phone.  From Reyes's end of the conversation, she could tell that the victim had been located.[4]

"Reyes had his girlfriend drive to the home of another friend. Reyes and the friend mostly spoke outside the hearing range of the girlfriend, but she was able to hear

---

**3**  "The garage of Beavers's father's house had been converted into a bedroom and bathroom where Beavers, his girlfriend, and their child lived."

**4**  "The victim had been arrested for possession of one gram of methamphetamine, while visiting Reyes's girlfriend, on April 10, and had been released from jail on April 22."

the friend prevail upon Reyes to promise that there would be no violence that night. Although the girlfriend wanted to go home, Reyes had her drive to a trailer park. Jimenez and the victim were standing outside. Reyes got out of his car and spoke to the victim. The girlfriend understood that they had come together because of the methamphetamine that was missing from Reyes's backpack. The victim got into the back seat of Reyes's car, between Reyes and his friend, without resisting and without having to be pushed by Reyes. It appeared that everyone intended to go to the next destination in an effort to resolve the problem of the missing methamphetamine.

"When they left the trailer park, Jimenez was driving because Reyes's girlfriend, fearing possible violence, told Reyes that she did not want to. Reyes said they were going to Beavers's garage. The victim wanted to explain that he had been in jail, because his absence had made others assume that he had taken the missing methamphetamine.[5] Reyes told the victim not to say anything until they got to Beavers's. During the trip, she heard a slap emanate from the back seat, then the victim's voice. Reyes also made a call on his cell phone during the five-minute trip.

"They arrived at Beavers's around midnight. Beavers was outside and approached Reyes's car while Reyes got out. Reyes had put a small handgun[6] in his girlfriend's lap, and she had immediately handed it to Jimenez because she did not want it. She had seen it once before in Reyes's possession. Although the girlfriend did not want to be there and

---

[5] "The girlfriend also testified that there were rumors 'on the street' to this effect. She said that Reyes was suspicious of her, Beavers and the victim."

[6] "She identified it as the gun Jimenez later threw into the desert."

5

did not want to get out of Reyes's car, she did so at the latter's direction, telling Reyes that she wanted to go home.

"While the victim, Jimenez and Reyes's friend remained in Reyes's car, Reyes, his girlfriend and Beavers entered the latter's garage.  Reyes told Beavers that if the former had been mistaken previously in accusing Beavers of taking the methamphetamine, he was sorry and he was going to confront the victim and find out what had happened to it.

"Reyes's girlfriend again unsuccessfully asked him to take her home.  Reyes removed his wallet, cell phone, watch, and ring, and gave them to her.  She suspected there was going to be a fistfight involving the victim.

"She heard her pitbull outside fighting with Beavers's dog and she dropped Reyes's possessions and went outside to separate them.  As she was doing so, she saw Jimenez, the victim, and, lastly, Reyes's friend walk by her and go into the garage.  Beavers joined Reyes's girlfriend in trying to separate the dogs and he eventually put his dog in his father's house.[7]  The girlfriend chased her pitbull into the garage where Reyes and the victim were yelling at each other.  Reyes hit the victim in the head two times with his gun that had a clip.  The girlfriend sat in a chair, attempting to hold her pitbull's head.  Jimenez tried to hold the victim back by grabbing his hand, trying to cover his face and pushing on him when the latter began fighting back with Reyes.  Jimenez held the victim's hands behind his back while the latter knelt, and Reyes hit him in the head with the gun after each of the two times the victim asserted that he had been in jail in response

_____

[7]  "See footnote 2, *ante*."

6

to Reyes's demands for information as to his whereabouts. Reyes's girlfriend, who was afraid, remained in the chair holding on to her pitbull. Reyes's friend appeared to be scared. Beavers did not, but, nonetheless, did nothing to participate in the assault upon the victim.[8] While the victim's hands were connected together, Jimenez kicked him in the lower body between two and five times and he and Reyes hit him. The victim's head and face were bleeding profusely and some dripped onto the upper portion of the girlfriend's jeans. The victim began to break free and pull his hands apart, and the girlfriend noticed black tape on them.[9] The victim grabbed a candlestick in his left hand and waived it around to keep Reyes and Jimenez away from him. At the same time, he held out a knife in his right hand. The girlfriend continued to restrain her pitbull, who was barking. A gun was shot at a time when the girlfriend saw Reyes's gun in his hand, but no gun in Jimenez's hand. The shot scared the pitbull, who jumped into the girlfriend's arms. On her way out to Reyes's car with the dog, she saw a gun, larger than the one she had earlier handed to Jimenez, in the latter's hand, and the gun with the clip still in Reyes's hand. Reyes's friend followed her out to the car. She heard three or four more shots and saw Beavers standing outside the garage. After the shots went off, Beavers nodded his head and hit himself on the forehead, as if to say, 'Oh, my God.' Jimenez and Reyes ran out of the garage and the former got into the back seat of the car.

---

**8** "Reyes's girlfriend testified that neither she nor Reyes's friend touched the victim."

**9** "She testified that despite her pretrial statement that Jimenez had taped the victim's hands together, she had not witnessed this, but had assumed that to be the case because she had seen Jimenez holding the victim's hands together."

Reyes got into the front passenger seat and told his girlfriend to drive, but she was 'frozen' and said she could not. Reyes got out of the car and got into the driver's seat, pushing his girlfriend over. As he was driving away, Jimenez said he had forgotten the bullets or shells. Reyes told him not to worry, that it was taken care of.

"The girlfriend had been charged with murder and kidnapping, but had pled guilty to assault causing great bodily injury or with the intent to cause same. She was to receive a suspended sentence in exchange for her plea and her truthful testimony at Jimenez's trial.

"*The Testimony of Donald Beavers*

"Beavers, a methamphetamine user, bought his drugs from Reyes. At times, the victim delivered them for Reyes. Reyes was a 'pretty strong' person and Beavers feared him. Reyes always carried one gun, at times, two. In early April, Reyes, his girlfriend, and the victim had come to Beavers's garage. Beavers saw two 'eight balls' of methamphetamine, each weighing about three and one-half grams. Beavers sampled some of it. Reyes told him that he could not buy any of it until the following day. Beavers was told that Reyes had a pound of methamphetamine, valued at $5,000 or $6,000, on him, although Beavers did not see it. After they left, someone called, looking for Reyes's backpack, which the person claimed had been left behind. However, Beavers did not find it.

"Later that day, Reyes, the victim, five or six Hispanic males, and two Caucasian members of the local Hell's Angels, all armed, came to Beavers's garage. Reyes and the

8

Hell's Angels members questioned Beavers and searched the garage. Reyes was 'pretty upset' about the loss of the methamphetamine. Jimenez arrived two hours later.

"Around 10:30 p.m. on April 22, Reyes telephoned Beavers at the garage and told him to wait for them by the curb, that they were going to pick him up. Beavers did not know why and was not concerned. When they did not arrive, Beavers went back inside, but within 30 minutes of the first call, a woman he assumed was Reyes's girlfriend called on Reyes's behalf and Beavers went back outside. They arrived in Reyes's car. Jimenez and Reyes's friend were in the back and Reyes and his girlfriend were in the front. Reyes, his girlfriend, her pitbull, and Beavers went inside the garage. Beavers was told that they were going to take care of the problem that had arisen earlier. Beavers did not know what they meant. Reyes, who was wearing a white shirt, asked to borrow a dark one from Beavers. He gave his jewelry to his girlfriend and put on Beavers's shirt. Reyes had a gray automatic, appearing to be a nine-millimeter, which Beavers had seen in his possession on two prior occasions. The pitbull and Beavers's dog did not get along, so Beavers put the latter into his father's house. As he returned to the garage, he saw Jimenez, Reyes's friend and the victim get out of Reyes's car. Jimenez had his hands on the victim's left shoulder or arm and he walked alongside the victim, whose hands were behind his back. Reyes's friend followed them into the garage. Reyes's girlfriend handed Jimenez a small handgun which appeared to be the one that Jimenez later threw into the desert. Reyes and Jimenez, with their hands on the victim, walked the

9

latter to a wall near the bed where they questioned him.[10]  It looked as though the victim did not want to be there.  Beavers testified that, at that time, '[The victim's] hands had been bound and they were binding him.  [¶][T]hey asked [Beavers] if [he] had any tape, . . . and that's when [he] noticed that [Jimenez] was trying to re-tape or tape [the victim's] hands behind his back . . . [¶] with black electrical tape' similar to that found on the victim's right wrist when his body was later discovered by the police.  . . .  Beavers explained that he said that Jimenez had rebound the victim's hands because when he saw the victim enter the garage, the latter had his hands behind his back Beavers did not know where the black electrical tape had come from—he stated that it came with Reyes and Jimenez.  Reyes demanded that Beavers get tape, as they had run out.  Beavers left and returned three or four minutes later with red tape he knew would not work.  He deliberately chose the tape because he did not want any part of what was going on.  Jimenez unsuccessfully tried to use it.  The victim said he did not take the dope, that he would make it up to Reyes, and he would not do it again because he was his friend.  Reyes questioned the victim in Spanish, which Beavers did not understand.  He was angry at the victim.  He yelled at him and hit him once in the face and once on top of his head with the nine-millimeter semiautomatic.  Beavers was scared, not angry.  He did not want to see the victim get hurt or killed.  Reyes's friend acted scared.  Jimenez was calm. He had a .357 or .45–caliber handgun, which Reyes had previously had, sticking out of

---

**10**  "Beavers testified that four or five minutes after he returned to the garage from putting his dog into the house, the dog made his way back to the garage and Beavers had to once again put him back into the house."

10

his pants. The pitbull attacked the victim while the latter was on his knees. Reyes yelled at his girlfriend to control the dog and the victim stood, pulling his hands apart.[11] Jimenez slapped the victim, who said if they were going to kill him to do so, but stop beating him.[12] The victim grabbed a heavy candlestick and hit Jimenez over the head. Reyes accidentally fired his gun while trying to chamber a round and the bullet went through the bathroom door jamb and into the bathtub. Jimenez bled profusely and staggered. He pulled out a .25–caliber pistol and pointed it at the victim. He and the victim struggled over it. The victim pulled out a pocket knife and threatened Jimenez with it. He made jabbing motions at Reyes and Jimenez with it, stabbing the latter. He dropped the knife after Reyes hit him above the eye with the candlestick. Reyes swung the candlestick at the victim a second time, but Beavers did not see if it made contact. Reyes and Jimenez both hit the victim. Jimenez hit him in the head once with a big gun. He kicked the victim in the side while the latter was on the floor. Reyes ordered his girlfriend, his friend, and Beavers to leave, which they did. As they left, Beavers saw the victim, Reyes, and Jimenez move towards the bathroom and the .357 or .45–caliber gun in Jimenez's hand. Through the open door to the outside, Beavers saw Reyes push the

---

[11] "Beavers did not know whether Reyes's girlfriend accidentally hit or kicked the victim while trying to control her dog, or intentionally hit or kicked the victim."

[12] "Contrary to the implication in Jimenez's statement of facts, there was evidence that Jimenez hit the victim before the latter hit Jimenez with the candlestick and stabbed him with the knife. We note that in his reply brief, Jimenez cites, without criticism, the People's assertion in their brief that he admitted to police that he hit the victim one time in the face 'apparently before [the victim] took any actions to defend himself.' "

victim into the bathroom. Jimenez was behind Reyes, who had the nine-millimeter gun. Reyes's arm came up and he pointed at the victim, who was on the floor. Beavers heard two shots. Reyes crouched over the victim with the arm extended, holding the gun. Another shot went off. All the shots sounded the same.

"Reyes came outside, holding his gun, and Jimenez followed. Jimenez told Beavers to get rid of the body. Reyes told Beavers not to call the police or they would return and get his family. Because of this, Beavers did not report the crimes. Beavers received five other threats not to testify.

"Beavers preserved items of evidence for the police and dumped the victim's body where he knew it would be found quickly.

"At jail, Jimenez told Beavers that Reyes's girlfriend had given him the .25–caliber gun, but it did not work.

"Beavers denied having a gun during the attack or hitting or kicking the victim. He denied doing anything to facilitate the victim's death other than getting the tape and, after the murder, cleaning the garage and removing and dumping the body.

"Beavers was charged with murder and kidnapping. He pled guilty to kidnapping. Defense counsel asked Beavers during trial, '[W]as that kidnapping charge just a convenience so that you could plead to something?' Beavers responded in the affirmative.

"*Other Evidence*

"Beavers's girlfriend testified that Reyes had been to the garage three or four times before the day the methamphetamine turned up missing, she guessed, selling drugs

12

to her boyfriend. She confirmed that before the crimes Reyes and others had come to the garage in connection with the missing methamphetamine, and she had gone into the house during the three-hour incident. She said that late on April 22, Beavers got a phone call which he responded to by saying, 'Okay,' more than once. She feared the call involved the missing methamphetamine and she warned Beavers not to go. He was upset when he left. She took their child into the house and stayed there the rest of the night.

"The victim's sister testified that she had dropped him off at the trailer park at his request at 11:30 p.m. on April 22. A man, whom her brother recognized, but was not Jimenez, approached her car. The victim and the man talked and the man was mad. The victim told his sister to leave, that the man would take him somewhere.[13]

"During an interview with police following his arrest, Jimenez admitted being with the victim in the trailer park. He admitted going to a place that matched the description of Beavers's garage, but denied that there had been an argument in the car on the way. However, the victim got slapped during the ride, although Jimenez did not see who did it. Reyes's girlfriend handed him a .25–caliber gun outside their destination, which he put in his back pocket. He denied firing the gun. He taped the victim's hands behind him, with tape someone handed to him, but there was not enough and the victim got loose. After the victim 'got smacked around a little bit' and he was on his knees, he

---

**13** "Earlier, the victim had asked his sister to take him to a home some people had just rented on the street where his body was eventually discovered. However, after having dinner with his sister, the victim said it was too late for the rendezvous and he asked her to leave him at the trailer park. It is not clear whether the man the victim met at the trailer park was supposed to take him to the rendezvous, or somewhere else."

got up and said, ' "Kill me, come on." ' The victim got a knife and cut Jimenez's pinkie finger and hit him in the head with a candlestick. Jimenez admitted hitting the victim and hearing shots. The victim repeatedly denied stealing the drugs. Reyes's girlfriend hit and kicked the victim. Jimenez threw the .25–caliber gun into the desert, and, after his arrest, he helped law enforcement officers find it.

"According to a police detective, when Jimenez was arrested late on April 23, he had a recent significant wound to the top of his head, which he attributed to the victim, and a scratch on his face. Photographs shown to the jury depict these injuries."

B.      PROCEDURAL HISTORY

When the trial court ruled on defendant's section 1170.95 petition, the court found that the prosecution had proved beyond a reasonable doubt that, even with the changes in the law, defendant was still guilty of first degree felony murder because he was "a major participant in the kidnap murder and he acted with reckless indifference to human life."

The court noted that defendant was present at the scene of the killing and "could have attempted to deescalate the beat down that was going on, but he did not. Instead [defendant] participated in it. Once a gunshot was fired that went through a wall, he could have tried to deescalate the situation, but he continued to engage."

The court went on to state that "[w]hen Mr. Reyes was moving [the victim] into the bathroom [defendant] could have again tried to deescalate the situation, but he continued to participate. Those were all things proved beyond a reasonable doubt." Additionally, the court found that after the lethal force was used, defendant "made no attempt to render or obtain medical assistance from [sic] [the victim]. . . . It's particularly

14

significant that the Defendant was physically present at the scene and made no attempt to prevent the shooting or assist the victim."

Thereafter, the court stated:

"I think applying the *Tison*/*Edmund* continuum with the *Banks*/*Clark* factors the evidence overwhelmingly shows that [defendant] was a major participant in the kidnap murder and acted with reckless indifference to [the victim]'s life. He was present. He [was] actively involved in the entire sequence of criminal activity leading to the murder. He participated in the initial kidnapping of [the victim]. He personally bound [the victim]'s hands. He personally escorted [the victim] into the garage of the apartment. He personally restrained [the victim] as Mr. Reyes pistol-whipped him. He personally beat and kicked [the victim]. He was armed with and personally pointed a gun at [the victim]. He personally hit [the victim]in the head with a gun. Lastly, he personally helped escort [the victim] at gunpoint into the bathroom immediately before the shooting. He was fully aware of the fact that Mr. Reyes's conduct was escalating. That the beating had turned into torture and instead of trying to deter or deescalate he continued to engage in it. So the court finds beyond a reasonable doubt that [defendant] remains guilty of first degree murder under the new law because he was a major participant in the kidnap murder and acted with reckless indifference to [the victim]'s life."

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of

15

the case, a summary of the facts, and potential arguable issues, and has requested this court to undertake a review of the entire record. Pursuant to *Anders*, counsel identified the following issue to assist the court in its search of the record for error:

1. "Whether sufficient evidence supports the trial court's finding, beyond a reasonable doubt, that [defendant] was ineligible for resentencing under section 1170.95."

We offered defendant an opportunity to file a personal supplemental brief, and he has not done so.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error. We are satisfied that defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*Id.* at p. 126; *Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

## DISPOSITION

The trial court's denial of defendant's petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.

16